There really is only one issue here and it is whether or not Mr. Van Haften's actions in traveling to Syria constitute a federal time crime of terrorism. It is not just that he offered to provide material support, which is the crime itself, it is really what lies behind that and I think the crux of the argument is really is it the object of the act or is it his motivation and depending on how this court rules that really becomes the test. We think that there is more than a mountain of evidence as to Mr. Van Haften's delusional beliefs and to all of his very mixed and myriad motives. But can you explain to me, I gather there was some investigation into Mr. Van Haften's psychological condition before he entered the guilty plea. Yes. That's right. And the finding was made that he was capable of pleading guilty. Does that shed any light? Because your argument seems to be he's just so deluded that he couldn't possibly have had the kind of intention or plan to commit a terrorist act as defined by the statute. And yet there are a lot of people who are half a bubble off plum but they're still able to do some very serious damage. We unfortunately see it every day and so it seems to me the facts found here by the district court judge were that Mr. Van Haften was one of those people. He had a lot of things wrong with him, the judge says that, but he thinks that he still had in mind trying to do what he could to kill Americans. He was very angry about his sex offender conviction and lifetime duty to register for that. He says he's just a very angry person it seems. That is borne out in the Facebook post. Your question to unpack it, he has the capacity to act. He's definitely competent. There's no question about it. He has the capacity to act and he's very angry at the United States and he says all these things in a variety of ways, primarily I guess these posts, but other ways as well. He goes over to Turkey, he wants to kill U.S. soldiers, he's trying to get himself into Syria. This is pretty serious behavior. And the judge gives him quite a break actually from the guidelines range. First the statute caps it and then the judge goes down significantly from the statutory cap. It is serious behavior but the question is really what motivated that behavior. And what motivated that behavior, you do have two years. We have about 10,000 pages of discovery. And out of that, the statements that we have, the most inflammatory are really the likes. It's just him on his phone pressing the thumbs up button. The other two are just a couple screams. And I'm not to say that those aren't alarming. And I'm not asking that he get an apology or that we say hey you shouldn't have been convicted. I'm saying what was behind those actions. And what motivated those actions is really borne out in those two years of posts. But the government argues I think persuasively that people can have mixed motives. And maybe he thought the apocalypse was coming or maybe he thought some other things were going on, that zombies were going to rule the earth. I don't know what he thought. But some of those things he seems to say. And yet at the same time you get this theme that the United States has ruined my life. The state of Wisconsin criminally prosecutes him for behavior that he clearly regards as innocuous behavior. He's got this lifetime obligation. So he's angry. So isn't that one of the motives? It is one of the motives. But when you look at what is the motivation, you can look at the Mann Act or the Travel Act cases. What is your primary motive? What predominates over the other ones? Well where is primary motive in the guideline? It's not. Nor is motive in the guideline. But that's what the court has to actually extrapolate from. We can't say that if 1% of your motivation is as an afterthought I kind of hate America too, but I really want to avoid those zombies. So 99% of you is I want to get out of the zombies. And 1% of you is like and I don't like America. We don't say 500% increase to the guidelines. That's never been the standard in court circuits. But isn't that what 3553A is for? I mean it's hard to boil these down to percentages. And so here you have this guy who's talking about zombies or the apocalypse. And at the same time he's saying I hate America. And he's taking some concrete steps to do something about it so it seems. He is. And 3553A does come in. And I think it's over everything. It's an umbrella that the defense attorneys embrace and the government embraces as well. But that actually cuts to the circumstance. And that's why I cited to Christensen. There it is. The circumstance of the act really becomes was it the Hamas soup kitchen or was it the suicide bomber? Because if it's a soup kitchen maybe you're getting two years, maybe five years. And that's up to the district court's discretion. But you're not getting that 500% increase to 292 to 365 months. 3553A allows for the court to say properly calculated. What was the object of your act? That's the crime. What was the motivation of that? What drove you to do it? And then the circumstance. Suppose somebody's motivation. Let me give you a couple of motivations. One, I'm going to get paid a lot of money for doing this act. Another possible motivation, if I do this I'm going to go to heaven. And so I'm going to have a really nice afterlife. Another motivation, I'll be very famous. People will write articles about me all over the world. Does that matter if you know for a fact that you're going to go there and blow up a truck that has a bunch of U.S. soldiers on it? Yes, it does. It does. All three of those are apart from what the guidelines command and what the statute has said. What is it calculated to? And the reason it does, if you go back to the government's, I think it's footnote two, the Merkin case, they say this is an extreme guideline. This is a huge bump for somebody. But the reason is because the people who engage in this cannot be deterred. They're so resolute. They're the Messaouis of the world. They're the ones who they say, like, my lifeblood is there. But somebody who acts out of greed, they say, well, it's not profitable to me. The cost benefit ratio is not going to go. Somebody, I forget, famous. This sounds backward. Somebody who acts out of greed needs a very large sentence. Somebody who's undeterrable, a large sentence, well, it won't deter. You seem to have sentencing backward here, where the people who are undeterrable get the largest sentence and the people who are deterrable get a small one. What sense would that make? It makes sense because in one case, we have to incapacitate you. In another case, we're talking about the moral culpability. So the incapacitation says, look, no matter what, we can't let you out. You've got to go to supermax. The other guy who's greed, we say, you can be reasoned with. And maybe this was ill thought. You look at the Somali cases out of the Eighth Circuit, where it's these 18-year-old kids, and they say, look, we got through to them, and they're not going to do this again. Or we think, you know what, there are different motivations there. Those who are so resolute, those are the ones who we increase it for. And that's why it has to go to the motivation. And when the court probes the motivation, we see often, you know, like you say, oh, a defense attorney, you're building a mountain out of a molehill. But here, the court took a mountain, a mountain of evidence, two years that we presented to them, and said, it's just a molehill. You know, what really was motivating was those two Facebook posts and those five likes. And it's not enough to cherry pick those. And I agree, if it's a close call, it's clear error. I lose. But this wasn't a close call. I mean, we embed Facebook message after Facebook message, the conversation after conversation, showing, here's the development. He goes to the U.S. attorney and gives him that letter. He's interviewed three times. Every time, he's like, all right, guys, guess what? Zombies are coming. I'm out of here. 2015, blood moon, get out. And that's, he's speaking to that motivation. That motivation is pervasive, it's consistent, and it's everything that's about him. So I don't think that we can just reduce it and say, you know what, he also made these screeds, and therefore, they just sort of block out everything else that was going on. That's what the guideline's really trying to go at. How old is he at this point? Sorry, when he was in Syria or right now? Right now. 38. He might be 37. 37, late 30s. Aren't the contemporaneous postings and the conversation with his mother on the Facebook platform, et cetera, most probative of his motivation? I mean, those were immediately preceding his departure, right? No, the Zen one is the one right, sorry, do you mean departure going to Syria or departure as in before he's arrested on October 26? When he is, well, he's arrested in Turkey. Yes, ma'am. At the end of October. Correct. And the immediate, the chronology of Facebook posts, et cetera, in the period right before that reflect a more singular motivation, do they not? Especially the one to his mother? To his mother. Or is that, do I have the date wrong on that? I thought that was a few weeks before. It's throughout. You might be doing the July 23rd one. I'm focusing on the one that was important to the district judge. Okay. Where he says, if they ask you, this is why I'm really doing this. And said it's to, you know, if they ask you, tell them the truth, that I went to Iraq to fight the Americans. The only thing that matters to me is joining my brothers for the war against American liars. That seems to be fairly. Culpable. If that's embedded with the one with Hagel and Biden, then that's the one he qualifies. He says, hey, mom, thanks for bearing with me while I verbally vent. I'll check the record just to make sure exactly which one. I mean, there are 10,000 pages of it. Sure. But to get to that, I think the most probative one is actually the one that's right before his arrest. Because that's the one where he's not just posting, he's actually emailing with the CIA operative or whoever it is. But that's the one where he's showing his motivations. That's why I block quoted it for two pages. That's where it is. I will. Okay. Thank you.  May it please the court. The district court, we believe, is on solid footing in applying the terrorism enhancement here and in making the supporting calculation finding. In some, the defendant didn't just spout vitriol from the basement of his house in the United States. He traveled from the United States to Turkey, and he admitted in pleading guilty that he attempted to enter Syria, that he attempted to join ISIS, a group he admittedly understood was engaged in terrorist activities, and he made a number of statements at the time of the offense. And those are the statements that the district court focused on. Was there any question about, I mean, even if he was mentally competent to enter this plea, everybody was satisfied that his competence was approximately the same at all times, or worse or better? I can say, this judge, there was a competency evaluation at the defense's request. The BOP psychologist found the defendant to be competent to proceed to trial. The defendant accepted that finding. And then the defendant, I mean, the district court found that the defendant was competent to enter a knowing and voluntary plea. And there was never any question that, you know, this is now, that was then, that when he went to Turkey, for example, he was delusional or anything like that? Not that I'm aware of, Judge. I mean, the district court and we concede that he's got some wacky views that probably border on delusional. But the fact of the matter is the district court found that he was capable of calculation, and I don't understand the defense to be challenging that particular finding. And the district judge, at the end of its opinion, actually said, look, I'm going to consider some of this mental state. When we get to sentencing, and I'm applying the 35, 53 factors, and the court did so. It's our view, again, that the court was on solid footing and that even if the defendant had other purposes in mind, like escaping zombies or being in the caliphate at the time of the apocalypse, the existence of those other purposes don't preclude application of the enhancement, whereas here there are multiple statements from the defendant's own mouth stating that he's pledged allegiance to ISIS. He's praised the leader of Abu al-Baghdadi, the ISIS leader, in the same post where he includes a video of ISIS members fighting. He says he wants to kill Americans, and he expresses his anger at the United States. The United States asked for him to be extradited back from treaty? You know, the record's a little thin, and Mr. Bugney may know a little bit more. I don't know whether the United States was involved in his detention by the Turkish authorities. He was held there for a while, and I assume there was some – And then somehow he materializes back in the Western District of Wisconsin. He does. He was held there for a while, and it's clear the United States was contemplating his return because he was – so there was some communication at a minimum because he was arrested as soon as he arrived back in the United States. And he was affiliated with this other guy who they caught at the Atlanta airport? That's right, Leon Davis. And in the plea transcript, actually, the defendant conceded that the government could prove beyond a reasonable doubt that he encouraged and assisted Davis in Davis's efforts to leave the United States, travel to Turkey, enter Syria, and join ISIS. So this wasn't a case where it was just the defendant's own conduct directly. He also provided assistance and encouragement to this other person. I could go on, but unless there are other questions, I will just – I'll conclude now. I see none, so thank you very much. You ran out of time, Mr. Bugney, but I'm going to give you a minute to finish up. Judge Sykes' question is paragraph 43 of the PSR has it. That's also the statement with his mom where it says, don't worry, I'm actually going there to build roads and help with the helpless. So that was part of it. As to his competency, really it was whether or not we could sustain an insanity plea. And we felt that we couldn't given what we knew about Mr. Van Haften at the time he went there and also the continuing nature of the offense. Because there are definitely parts where he's a little bit more off balance than others, but we felt as a whole we would not be able to sustain that. As to Judge Easterbrook's question, I think it is correct that judges can allow for differing – the mercenary needs more time versus the undeterrable religious zealot. But really that's what is allowed for the judge's discretion at sentencing. And those are where the reasonable minds can disagree, and that's why they can deviate from the guidelines. But the first application and whether or not the court had a look at this mountain of evidence is really one that it should have. And that's why it erred and why it should be sent back for resentencing. Thank you. All right, thank you very much. Thanks to both counsel. We'll take the case under advisement. The court will be in recess.